## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1)   THE COUNTY COMMISSION OF CRAIG COUNTY, OKLAHOMA,

        Plaintiff,

v.                                             Case No. 22-cv-459-TCK- JFJ

(1)     WALMART INC., f/k/a WAL-MART STORES, INC.;
(2)  WAL-MART STORES EAST, LP;
(3)  WAL-MART STORES EAST, LLC f/k/a WAL-MART STORES EAST, INC.;
(4)  WSE MANAGEMENT, LLC;
(5)  WSE INVESTMENT, LLC;
(6)  WALGREEN CO.;
(7)  WALGREENS BOOTS ALLIANCE, INC.;
(8)  CVS HEALTH SOLUTIONS, LLC.,;
(9)  CVS INDIANA, LLC.;
(10)  CVS RX SERVICES, INC.;
(11)  CVS PHARMACY, INC., and
(12)  CVS TN DISTRIBUTION, LLC.

        Defendants.

## <u>COMPLAINT</u>

Plaintiff, the County Commission of Craig County, Oklahoma, by and through the Craig County Prosecutor's Office (the "County" or "Plaintiff") brings this action to prevent future harm and to redress past wrongs against the following Defendants ("Defendants" or "Pharmacy Defendants"): the Wal-Mart Defendants[1], Walgreens Defendants[2] and CVS Defendants[3] and states as follows:

---

[1] The Walmart Defendants are Walmart Inc., f/k/a Wal-Mart Stores, Inc.; Wal-Mart Stores East, LP; Wal-Mart Stores East, LLC f/k/a Wal-Mart Stores East, Inc.; WSE Management, LLC; and WSE Investment LLC.
[2] The Walgreens Defendants are Walgreen Co. and Walgreens Boots Alliance, Inc.
[3] The CVS Defendants are CVS Health Solutions, L.L.C.; CVS Indiana L.L.C.; CVS Rx Services, Inc.; CVS TN Distribution, LLC; CVS Pharmacy, Inc.

## **INTRODUCTION**

1.      Plaintiff seeks to hold accountable the Defendants that reaped enormous financial rewards by refusing to monitor and restrict the improper dispensing and distribution of opioids and abate the opioid epidemic in the County.

2.      For many years, the prospect of a major drug problem infiltrating the borders of Oklahoma, let alone Craig County, was inconceivable.

3.      By now, most Americans have been affected, either directly or indirectly, by the opioid epidemic.  This crisis arose not only from the opioid manufacturers' deliberate marketing strategy and opioid distributors' lack of suspicious order monitoring systems, but the Chain Pharmacies' equally deliberate efforts to evade restrictions on opioid dispensing. The Chain Pharmacies acted without regard for the lives that would be trammeled in pursuit of profit.

4.      Prescription opiates are narcotic drugs.  They are derived from or possess properties similar to opium and heroin and are categorized as "Schedule II" drugs due to their high potential for abuse and potential to cause severe psychological or physiological dependence.  The terms "opioids" and "opioid analgesics" describe the entire class of natural and synthetic opiates.

5.      Within the last 20 years, a scourge infected this country in the form of a public health epidemic caused by widespread addiction to opioids like OxyContin and Percocet, as well as generic forms of oxycodone and hydrocodone. The Food and Drug Administration ("FDA") originally approved opioid treatment for short-term post-surgical and trauma-related pain, and for palliative (end-of-life) care.[4]  Later, the label was stretched to reach treatment of patients with "chronic pain": pain lasting more than three months.

6.      In 2014, almost two million Americans were addicted to prescription opioids and

---

[4] Opioid was originally a term denoting synthetic narcotics resembling opiates but increasingly used to refer to both opiates and synthetic narcotics. Stedman's Medical Dictionary 27th Edition.

another 600,000 to heroin.[5] From 1999 to 2020, more than 263,000 people died in the U.S. from overdoses involving prescription opioids.[6]

7.     The Opioid Epidemic did not come to Craig County by chance.  Like other communities in America, Craig County fell victim to Chain Pharmacies that saturated the area with excessive amounts of dangerous and addictive prescription opioids under the guise of lawful and beneficial activity.

8.     This suit takes aim at a substantial contributing cause of the opioid crisis: the Chain Pharmacies, the last link in the opioid supply chain and the critical gatekeeper between dangerous opioid narcotics and the public, who utterly failed in their gatekeeper role, flouted their duties to protect the public, violated the laws designed to protect the public and dismantled and disregarded measures designed to protect the public health and safety. The Chain Pharmacies failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, and halt suspicious orders when they were identified, and instead actively contributed to the oversupply of such drugs and fueled an illegal secondary market. They also played an active role in helping the manufacturers promote their false marketing about opioids to health care providers, their own pharmacists, and the public.

9.     The mission of pharmacy practice is "to serve society as the profession responsible for the appropriate use of medications, devices, and services to achieve optimal therapeutic outcomes."[7] Chain Pharmacies subverted that role and instead played a significant role in a public health epidemic in the County.

10.     Defendants have contributed substantially to the opioid crisis by helping to inflate

---

[5] *See* https://www.ncbi.nlm.nih.gov/books/NBK458653/
[6] *See* https://www.cdc.gov/drugoverdose/deaths/prescription/overview.html
[7] Vision and Mission for the Pharmacy Profession, American Pharmacists Association, adopted by the APhA House of Delegates (March 1991).

the opioid market beyond any legitimate bounds and by flooding that market with far greater quantities of opioid prescriptions opioids than they know could be necessary for legitimate medical uses, while failing to report, and to take steps to halt suspicious orders and sales, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market.

11.     Defendants, acting in their capacity as distributors of opioids through a sophisticated closed distribution system described herein, had a duty to stop suspicious orders and report diversion. They disregarded their own real-time data and failed to report and/or halt red-flagged, facially suspicious orders from pharmacies.

12.     The primary motivating factor behind Pharmacy Defendants' actions that contributed to the Opioid Epidemic was maximization of profits.  The effect of their actions has been both long-term and wide-spread.  Within the next hour, six Americans will die from an opioid overdose; two babies will be born dependent on opioids and begin to exhibit symptoms of neonatal abstinence syndrome.

13.     As a direct and foreseeable result of Pharmacy Defendants' conduct, cities and counties across the nation, including Plaintiff, are now swept up in what the CDC has called a "public health epidemic" and what the U.S. Surgeon General has deemed an "urgent health crisis."[8] The increased volume of opioid prescribing, not all of which is for legitimate use, correlates directly to skyrocketing addiction, overdose and death; black markets for diverted prescriptions opioids; and a concomitant rise in heroin and fentanyl abuse by individuals who could no longer legally acquire or could not afford prescription opioids.

14.     This explosion in opioid use and Defendants' profits has come at the expense of

---

[8] *Examining the Growing Problems of Prescription Drug and Heroin Abuse*, Ctrs. For Disease Control and Prevention (Apr. 29, 2014), http://www.cdc.give.washington/testimony/2014/t20140429.htm; *see also*, Letter from Vivek H. Murthy, Surgeon General, Tide RX (Aug. 2016), http://turnthetiderx.org.

patients and residents and has caused ongoing harm to and a public nuisance in the County.

15.     Each Defendant contributed to creating a public nuisance of historic proportions, by flooding Craig County with excessive amounts of dangerous and addictive opioids.  Pharmacy Defendants' actions are a serious breach of the public trust which has resulted in drug misuse and abuse, addiction, and deaths, as well as great expense and financial impact for Craig County, a first responder to the Opioid Epidemic.

16.     In reaction to this man-made public health epidemic, in order to care for and protect the members of its community, Craig County incurred substantial costs to fund a wide range of public services including health care, foster case, law enforcement and emergency responder services, criminal justice administration, public assistance, addiction treatment programs, overdose reversal medication, treatment to babies affected by neonatal abstinence syndrome, and other services and programs.

17.     The burdens imposed on Plaintiff are not the normal or typical burdens of government programs and services. Rather, these are extraordinary costs and losses that are related directly to Defendants' illegal actions. The Pharmacy Defendants' conduct has created a public nuisance. Governmental entities, and the services they provide their citizens, have been strained to the breaking point by this public health crisis.

18.      The costs to Craig County include significant increases in expenditures on emergency services for responding to the overdose calls as well as law enforcement call-outs to investigate crimes that are the natural product of increased drug abuse.

19.     These costs should be borne by the Pharmacy Defendants, as creators of the issues plaguing this community, rather than the county's taxpayers.  This action is therefore brought to expose the Pharmacy Defendants' misdeeds, stop the proliferation of opioids, recoup the expenses

and penalties owed, recover the damages suffered by Craig County, and perhaps most importantly, to abate the continuing public nuisance caused by the actions of Pharmacy Defendants and force them to help fund and solve the problem they created.

20.     Defendants have not changed their ways or corrected their past misconduct but instead are continuing to fuel the crisis and perpetuate the public nuisance.

21.     Plaintiff brings this suit to bring the devastating march of this epidemic to a halt and to hold Defendants responsible for the crisis they caused.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1), this case is a civil action where matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

23.     Venue is properly set in this District pursuant to 28 U.S.C. § 1391(b) since Defendants transact business within this judicial district.  Likewise, a substantial part of the events or omissions giving rise to the claim occurred within this judicial district.

24.     Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, the Court has personal jurisdiction over Defendants, because the cause of action alleged in this Complaint arises out of each Defendant's transacting business in the State of Oklahoma. Defendants have purposefully directed their actions towards Oklahoma and/or have the requisite minimum contacts with Oklahoma to satisfy any statutory or constitutional requirements for personal jurisdiction.

25.     This court has personal jurisdiction over Defendants pursuant to and consistent with the Constitutional requirements of Due Process in that Defendants, acting through their agents or apparent agents, committed one or more of the following:

    a.   The transaction of any business within the state;

    b.   The making of any contract within the state;

    c.   The commission of a tortious act within this state; and

    d.   The ownership, use, or possession of any real estate situated within this state.

26.    Requiring Defendants to litigate these claims in Oklahoma does not offend traditional notions of fair play and substantial justice and is permitted by the United States Constitution. Plaintiff's claim arises in part from conduct Defendants purposefully directed to Oklahoma and Craig County.

## PARTIES

### I.    PLAINTIFF

27.    Plaintiff, the County Commission of Craig County, Oklahoma, is authorized to bring this action on behalf and for the benefit of Craig County at large. *See* 19 OKLA. STAT. §1. The Craig County Prosecutor's Office is located at 200 S. Lynn Riggs Blvd., 2nd Floor, Claremore, Oklahoma 74017. The County provides many services for its residents, including public assistance, law enforcement services, criminal justice services, addiction and mental health services, and services for families and children.

### II.    PHARMACY DEFENDANTS[9]

### A.    <u>WAL-MART</u>

28.    Defendant Walmart Inc., formerly known as Wal-Mart Stores, Inc., is a Delaware corporation with its principal place of business in Bentonville, Arkansas.

---

[9] The County has made its best efforts, based on the information available, to identify all of the corporate entities with responsibilities related to the sale and distribution of opioids in or affecting the County. If information that becomes available to the County alters its understanding or discloses additional entities, the County reserves the right to seek to join any such entities as defendants. Furthermore, the County recognizes that corporate entities affiliated with the Defendants may possess discoverable information relevant to the County's claims, even though those entities have not been named as defendants. The County reserves the right to seek all information relevant to these claims.

29.     Defendant Wal-Mart Stores East, LP is a Delaware limited partnership with its principal place of business in Arkansas.

30.     Defendant Wal-Mart Stores East, LLC f/k/a Wal-Mart Stores East Inc., is an Arkansas limited liability company with its principal place of business in Bentonville, Arkansas.

31.     Defendant WSE Management, LLC, is a Delaware limited liability company, and owns one percent of Wal-Mart Stores East, LP.

32.     Defendant WSE Investment, LLC, is a Delaware limited liability company, and a ninety-nine percent owner of Wal-Mart Stores East, LP.

33.     The sole owner and member of both WSE Management, LLC and WSE Investment, LLC is Wal-Mart Stores East LLC (formerly known as Wal-Mart Stores East, Inc.), an Arkansas limited liability company.

34.     The sole shareholder of Wal-Mart Stores East, Inc. is Walmart Inc., f/k/a Wal-Mart Stores, Inc.

35.     Defendants Walmart Inc., f/k/a Wal-Mart Stores, Inc., Wal-Mart Stores East, LP, Wal-Mart Stores East, LLC f/k/a Wal-Mart Stores East Inc., WSE Management, LLC, WSE Investment LLC, and Wal-Mart Stores East, Inc., are collectively referred to as "Walmart."

36.     Walmart, through its various DEA registrant subsidiaries and affiliated entities, conducts business as a registered wholesale distributor and as a pharmacy.  At all times relevant to this Complaint, Walmart distributed and/or dispensed prescription opioids throughout the United States, including in Oklahoma and the County specifically.

**B.     <u>WALGREENS</u>**

37.     Defendant Walgreen Co. acted as a retail pharmacy in the United States, until Walgreen Co. completed the acquisition of Alliance Boots, a British pharmacy giant, in 2014.

After this acquisition, the company simply became Walgreens Boots Alliance, Inc., traded on NASDAQ under the symbol WBA.

38.     Defendant Walgreens Boots Alliance, Inc. is a Delaware corporation that describes itself as the successor of Walgreen Co., an Illinois corporation. Both Walgreens Boots Alliance, Inc. and Walgreen Co. have their principal place of business in Illinois.

39.     Walgreen Co. is portrayed as a subsidiary of Walgreens Boots Alliance, Inc. and does business under the trade name "Walgreens."

40.     During the relevant time period, Walgreens self-distributed opioids and cocktail drugs to its own pharmacies from distribution centers which it owned and operated. At least between 2006 and 2014, Walgreens distributed opioids and cocktail drugs from its distribution centers, including those in Jupiter, Florida, Perrysburg, Ohio, and Mount Vernon, Illinois, to Walgreens retail pharmacies located in Oklahoma, including the County.

41.     Defendants Walgreens Boots Alliance, Inc. and Walgreen Co. are collectively referred to as "Walgreens."

42.     Walgreens conducted business as a licensed wholesale distributor, as described above. Throughout the relevant time period, and as further alleged below, Walgreens entities also owned and operated pharmacies in the County. At all times relevant to this Complaint, Walgreens distributed and/or sold prescription opioids throughout the United States, including in Oklahoma.

43.     The DEA distribution registrations for Walgreens's controlled substances distribution centers that distributed opioids and cocktail drugs into the County were held by Walgreen Co.

44.     Walgreen Co. created, implemented, and had the power to enforce policies, practices, and training regarding distribution and sales in all Walgreens distribution and pharmacy

sales operations.

45.    The DEA dispensing registrations for Walgreens's pharmacies in the County were held by Walgreen Co., which operated each pharmacy as a "d/b/a/" entity.

46.    Expanding its chain pharmacy operations, Walgreens also acquired a number of former Rite Aid stores, including in the County. Walgreens is liable as a successor for these stores' prior conduct, as well as for its own operations.

**C.    CVS**

47.    Defendant CVS Health Solutions, LLC ("CVS Health") is a Delaware corporation with its principal place of business in Rhode Island. CVS Health, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor and also operates retail stores, including in and around Plaintiff's geographical area, which distributes and dispenses prescription opioids.

48.    Defendant CVS Indiana L.L.C. is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana. Upon information and belief, the identification of and due diligence on suspicious opioid orders for the entire country was performed at CVS Indiana L.L.C.

49.    Defendant CVS Rx Services, Inc. is a New York corporation with its principal place of business in Chemung, New York.

50.    Defendant CVS TN Distribution, LLC is a Tennessee limited liability company with its principal place of business in Knoxville, Tennessee.

51.    Defendant CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island. CVS Pharmacy, Inc. is a wholly owned subsidiary

of CVS Health.  Defendant CVS is both a DEA registered "distributor"[10] and a DEA registered "dispenser"[11] of prescription opioids and cocktail drugs and is registered to do business in Oklahoma.

52.   Defendants CVS Health Solutions, L.L.C.; CVS Indiana L.L.C.; CVS Rx Services, Inc.; CVS TN Distribution, LLC; and CVS Pharmacy, Inc., are collectively referred to as "CVS." CVS conducts business as a licensed wholesale distributor and dispenser.  At all times relevant to this Complaint, CVS distributed and/or dispensed prescription opioids throughout the United States, including in Oklahoma.

**D.   RELATED ENTITIES; AGENCY AND AUTHORITY**

53.   Defendants include the entities named above as well as their predecessors, successors, affiliates, subsidiaries, partnerships and divisions to the extent that they are engaged in the manufacture, promotion, distribution, sale, and/or dispensing of opioids.

54.   All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

55.   Plaintiff alleges that the corporate parents named as Defendants in this Complaint are liable as a result of their own actions and obligations in distributing and selling opioids, and not solely because of their vicarious responsibility for the actions of their pharmacy stores.

**<u>FACTUAL BACKGROUND</u>**

---

[10] 21 U.S.C. §802(11) and §822(a)(1).
[11] 21 U.S.C. §802(10) and §822(a)(2)

56.     Craig County, Oklahoma with a population of approximately 14,115[12], is an idyllic county with a rich history, proud of its people, and committed to creating and preserving the American way of life for its many residents.

57.     Craig County hosts predominantly middle-class families in Oklahoma.  Still, within this modest setting rages an unexpected war between health and opioid-addiction.  As of 2017, the Centers for Disease Control and Prevention, hereinafter "CDC," listed the overall prescribing rate of opioids at 58 opioid prescriptions per 100 people.[13]  Craig County, like many small communities throughout the country, faces a long road of re-education, rehabilitation, and rebuilding in the wake of what has become popularly known as the "Opioid Epidemic."[14]

58.     Craig County, Oklahoma received approximately **2,289,555** retail dosage units of opioid analgesics from 2006 until 2014, from Wal-Mart alone.[15]  Each Defendant played their respective part or at a minimum, remained silent about the absurd volume of opioids which they dispensed into Craig County.

59.     The resulting damage to Craig County has been devastating.  The problems Craig County, its residents and visitors, its businesses and schools, its police and courts, are currently facing were caused by the Defendants' reckless disregard for the safety and wellbeing of Plaintiff's residents.

## III.     OPIOIDS GENERALLY

60.     As explained above, the term "opioid" refers to a class of drugs that bind with opioid receptors in the brain to produce analgesia, euphoria, and respiratory depression, among

---

[12] *See* https://www.census.gov/quickfacts/fact/table/craigcountyoklahoma/VET605220.
[13]  See https://www.cdc.gov/drugoverdose/deaths/prescription/practices.html, citing IQVIA Transactional Data Warehouse (TDW) 2006–2017.
[14]     L.   Manchikanti   et   al.,   *Opioid   Epidemic   in   the   United   States*,   available   at https://www.ncbi.nlm.nih.gov/pubmed/22786464.
[15] *See* https://www.slcg.com

other effects.  Natural opioids are derived from the opium poppy, but modern medicine has permitted for the creation and use of synthetic and semi-synthetic opioids.

61.     The medicinal properties of opioids have long been recognized, with the first widely known and used opioid drug morphine being commercially marketed as early as the 1820s. The use of morphine during the Civil War resulting in a slew of veteran morphine addicts.  Still, prescription opioids continued to be developed by pharmaceutical companies into the twentieth century.

62.     Perhaps as a reflection of the knowledge regarding addiction gained from early morphine use, opioids were limited to short-term use (not longer than 90 days), and in managed settings (e.g., hospitals), where the risk of addiction and other adverse outcomes was limited, for medical conditions such as post-surgical pain, trauma pain, and palliative care, for which opioids were proven effective.

63.     Although heroin and opium became classified as illicit drugs, there is little difference between them and prescription opioids. Prescription opioids are synthesized from the same plant as heroin, have similar molecular structures, and bind to the same receptors in the human brain.

64.     Due to concerns about their addictive properties, prescription opioids have usually been regulated at the federal level as Schedule II controlled substances by the DEA since 1970.

### A.   Opioids as Addictive Substances Subject to Tolerance Increases

65.     Any belief that long-acting opioids, such as OxyContin made by Defendant Purdue Pharma, would not cause abuse and addiction was never grounded in science, and has been expressly discredited.

66.     A principal risk of long-term opioid use is that effectiveness wanes and patient

tolerance increases, such that the dose necessary to reach previously obtained analgesic relief can become "frighteningly high."[16]  Where a patient reaches such doses, the risk and severity of withdrawal symptoms increases as well, leaving the patient at a higher risk of abuse, addiction, and progression to illegal drug use.  Users become convinced that the drug is "needed to stay alive."[17]

67.     Still, use for even a few weeks results in withdrawal symptoms when the opioid is discontinued, including severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, and delirium; these withdrawal symptoms may last months, depending on the duration of opioid use.

68.     In addition, patient tolerance to opioids' analgesic actions, which requires higher doses of drugs to have the same effect, rises at a faster rate than patient tolerance to the respiratory depressive effects of opioids.  Thus, increasing dose amounts and/or frequency to match tolerance of analgesic effect can lead to overdose and death even when opioids are taken as directed.

69.     In fact, all labels of Schedule II long-acting opioids must include the warning that the drug "exposes users to risks of addiction, abuse, and misuse, which can lead to overdose and death." The FDA now requires extended release and long-acting opioids to adopt "Risk Evaluation Mitigation Strateg[ies]" because the drugs present a "serious public health crisis of addiction, overdose, and death."

70.     The FDA thereby confirmed the line of thinking that pre-dated the opioid manufacturers Defendants' marketing scheme: due to their risks, opioids should be used "only

---

[16] M. Katz, Long-term Opioid Treatment of Nonmalignant Pain: A Believer Loses His Faith, 170(16) Archives of Internal Med. 1422 (2010).
[17] David Montero, *Actor's Death Sows Doubt Among O.C.'s Recovering Opioid Addicts*, The Orange Cnty. Reg. (Feb 3, 2014), https://www.ocregister.com/2014/02/04/actors-death-sows-doubt-among-ocs-recovering-opioid-addicts/ (accessed Dec. 20, 2017).

when alternative treatments are inadequate."  The FDA expressly recognized that no long-term studies demonstrate the safety and efficacy of opioids for long-term use.

71.     Because of their addictive effect, Dr. Robert DuPont, former director of the National Institute on Drug Abuse and the former White House drug czar, opined in 2011 that opioids are more destructive than crack cocaine:

> "[Opioid abuse] is building more slowly, but it's much larger. And the potential[] for death, in particular, [is] way beyond anything we saw then. . . . [F]or pain medicine, a one-day dose can be sold on the black market for $100. And a single dose can [be] lethal to a non-patient. There is no other medicine that has those characteristics. And if you think about that combination and the millions of people who are using these medicines, you get some idea of the exposure of the society to the prescription drug problem."[18]

72.     Even the creation of Abuse Deterrent Formula ("ADF") opioids failed to curb the addiction and prescription rate, with 96% of all opioid products prescribed in 2015 being non-ADF.[19]  The addiction to opioids is real and has proven very difficult to prevent, curb, and treat.

### B.  Opioids as Causing Significant, Non-Addiction Related Side Effects

73.     Opioid use comes with additional negative side effects not related to addiction.

74.     A 2008 study by the Mayo Clinic[20] found that patients who were weaned off opioids and followed a non-drug treatment experienced less pain than when they were on opioids and had improved functioning. Some plans cover these costs, but others do not.[21]

75.     Other studies have found opioids inefficient in treating migraine pain, and

---

[18] Transcript, Use and Abuse of Prescription Painkillers, The Diane Rehm Show (Apr. 21, 2011),
http://thedianerehmshow.org/shows/2011-04-21/use-and-abuse-prescription-painkillers/transcript.
[19] Peter J. Pitts, *Pharmacy benefit managers are driving the opioid epidemic*, SHAKOPEE V. NEWS, Nov. 21, 2017,
http://www.swnewsmedia.com/shakopee_valley_news/news/opinion/guest_columns/pharmacy-benefit-managers-are-driving-the-opioid-epidemic/article_2f6be2a1-c7a3-5f8d-9f3e-61d29d25c84b.html.
[20] Cynthia O. Townsend et al., *A longitudinal study of the efficacy of a comprehensive pain rehabilitation program with opioid withdrawal: comparison of treatment outcomes based on opioid use status at admission*, 140 J. PAIN, 177 (Nov. 15, 2008), available at https://www.ncbi.nlm.nih.gov/pubmed/18804915.
[21] Barry Meier & Abby Goodnough, *New Ways to Treat Pain Meet Resistance*, N.Y. TIMES, Jun. 22, 2016,
https://www.nytimes.com/2016/06/23/business/new-ways-to-treat-pain-without-opioids-meet-resistance.html.

associated with sleepiness, confusion, increase in frequency of headaches, and increase in depression susceptibility

76.     Increased opioid use is also associated with an increased likelihood of other mental health conditions such as anxiety, and psychological distress, healthcare utilization, and a general decrease in health and wellness.  In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[22] Many abusers start with legitimate prescriptions.

### C.  Opioids as a Gateway to Heroin Use

77.     Heroin produces a very similar high to prescription opioids but is often cheaper. While a single opioid pill may cost $10-$15 on the street, users can obtain a bag of heroin, with multiple highs, for the same price.

78.     Because of the disparate cost of heroin versus opioids and their similar effect, opioid abuse has triggered resurgence in heroin abuse. According to one national-level study, nearly 80% of heroin users reported that they used prescription opioids prior to heroin.[23]  Similar rates apply even to our nation's youth: a 2015 report out of New York University found that three-quarters of high school seniors nationwide who use heroin started with prescription opioids.[24]

79.     It is hard to imagine the powerful pull that would cause a law-abiding person who started on prescription opioids for an injury to turn to buying, snorting, or injecting heroin, but that is the dark side of opioid abuse and addiction.

---

[22] Rose A Rudd, et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, 64 MORBIDITY & MORTALITY WKLY REP. 1378, 1381 (Jan. 1, 2016), *available at* https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm.

[23] *See* https://nida.nih.gov/publications/research-reports/prescription-opioids-heroin/prescription-opioid-use-risk-factor-heroin-use

[24] *See* https://www.nyu.edu/about/news-publications/news/2015/december/from-popping-pills-to-using-heroin-nyu-study-finds-three-quarters-of-high-school-heroin-users-started-with-prescription-opioids.html

80.     The need to address heroin use and addiction has imposed additional burdens on Craig County and other Oklahoma cities and towns.

81.     Patients' wellbeing requires an open, honest, transparent communication of the risk and benefits of the drug between the manufacturer and prescriber, and among the prescriber, pharmacist, and patient together.  The distributor plays a crucial role in keeping dangerous and addictive pills out of the hands of pharmacies and abusers.  The Opioid Epidemic is an example of what occurs when the parties responsible for protecting patients let greed interfere with their duties.

## IV.     Defendants' Conduct Created an Abatable Public Nuisance

82.     As alleged throughout this Complaint, Defendants' conduct has created a public health crisis and a public nuisance.

83.     The public nuisance—i.e., the opioid epidemic—created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated by taking measures such as providing addiction treatment to patients who are already addicted to opioids, making naloxone widely available so that overdoses are less frequently fatal, and a number of other proven measures to address the epidemic.

84.     Defendants have the ability to act to help end the public nuisance, and the law recognizes that they are uniquely well positioned to do so. All companies in the supply chain of a controlled substance are primarily responsible for ensuring that such drugs are only distributed and sold to appropriate patients and not diverted. These responsibilities exist independent of any Food and Drug Administration ("FDA") or Drug Enforcement Administration ("DEA") regulation, to ensure that their products and practices meet both federal and state laws and regulations. As registered distributors and dispensers of controlled substances, Defendants are placed in a position

of special trust and responsibility and are uniquely positioned, based on their knowledge of prescribers and orders, to act as a key line of defense. Defendants, however, instead abused their position of special trust and responsibility within the closed system of opioid distribution and dispensing and fostered a black market for prescription opioids.

## V.    DUTIES OWED BY PHARMACIES UNDER OKLAHOMA LAW

85.    Oklahoma law mandates that all pharmacies apply for and receive a license from the Oklahoma State Board of Pharmacy.  59 Okla. Stat § 353.18 (2022), OAC 535:15-3-4.1, OAC 535:15-3-4.2, OAC 535:15-3-9. Continuing licensure is dependent upon compliance with laws and regulations relating to controlled substances. 59 Okla. Stat § 353.18, 21 U.S.C. §823 (2022).

86.    A prescription for opioids, as controlled substances, must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of professional practice. OAC 535:15-3-13(c).

87.    Oklahoma law prohibits the issuance of an initial prescription of any more than a seven-day supply of a Schedule II controlled opioid and requires that any opioid prescription for acute pain be limited to the lowest effective dose of an immediate-release formulation. 63 Okla. Stat. § 2-309I (2022).

88.    Pharmacists have a corresponding duty along with the prescriber to ensure that opioid prescriptions are written for a legitimate patient for a legitimate medical need in the usual course of practice for the prescriber. OAC 475:30-1-3.  The responsibility for proper dispensing lies on the pharmacist.  *Id.*  Pharmacists may refuse to dispense a prescribed controlled substance. OAC 535:15-3-13.

89. Both the pharmacy and the Pharmacist In Charge are responsible for implementing a written drug diversion detection policy, which must be available for review by the Oklahoma Board of Pharmacy. *See* OAC 535:15-3-2(f).

90. An electronic prescription may be used for Schedule II controlled substances and such prescription with an electronic signature may serve as an original, subject to the requirements of 21 CFR, section 1311 et seq. 63 Okla. Stat. § 2-309v1 (2022).

91. Prescriptions for opioids must bear the name of the prescriber, either stamped or printed on the face of the prescription. Prescriptions must also contain the address and Federal Drug Enforcement Administration registration number of the prescriber, the date of the delivery of the prescription, the name, dosage and strength per dosage unit of the controlled substance, the name and address of the patient, the directions for use and any cautionary statements required. of the prescriber stamped or printed on the face of the prescription and must be manually signed. OAC 475:30-1-4(c).

92. Prescriptions for opioids are valid only for 30 days from the date of the prescription. OAC 475:30-1-4(c)(2).

93. Pharmacies must maintain adequate security of controlled substances and report robberies or thefts of controlled substances. *See* OAC 535:15-3-2(j). Instances of unprofessional conduct include the following: Making or filing a report or record that a pharmacist or pharmacy knows or should have known to be false, intentionally or negligently failing to file a report or record required by federal, state or local laws or rules, willfully impeding or obstructing such filing, or inducing another to commit such a violation, practicing pharmacy without reasonable skill and safety by reason of illness, use and/or abuse of drugs, narcotics, chemicals, or any other type of material, or as a result of any mental or physical condition, abuse of alcohol or habit-

forming drugs, knowingly dispensing a prescription drug after the death of a patient, knowingly billing or charging for quantities greater than delivered, or for a brand when a generic or a compounded product is dispensed, submitting fraudulent billing or reports to a third party payor of prescription drugs, and refusing to answer reasonable questions or provide information about prescriptions dispensed by the pharmacy when requested by, or for, the patient and that would aid the patient's health in the professional judgement of the pharmacist. OAC 535:10-3-1.2(4).

94.     Pharmacists are required to counsel patients on matters that the pharmacist believes will optimize drug therapy. *See* OAC 535:10-9-2.

95.     Pharmacists have a duty to refrain from engaging in unfair, false, misleading and/or deceptive trade acts or practices. *See* OAC 535:10-3-1.2.

## VI.     DUTIES OWED BY DISTRIBUTORS IN OKLAHOMA

96.     Each Defendant identified herein distributed and placed into the stream of commerce prescription opioid drugs. Each Defendant was engaged in "distribution" or "wholesale" transactions involving opioid drugs.

97.     Distributor Defendants are "registrants" under the federal CSA. 21 C.F.R. § 1300.02(b) defines a registrant as any person who is registered with the DEA under 21 U.S.C. § 823. Section 823(b), in turn, requires distributors of Schedule II controlled substances to register with the DEA.

98.     Oklahoma law mandates that all wholesale drug distributors, as defined in Oklahoma Statutes § 59-353.1, seek licensure with the Board of Pharmacy. OAC 535:20-7-3. Upon information and belief, each Distributor Defendant maintained an appropriate registration for the distribution of controlled substances pursuant to Oklahoma law and conducted business within Craig County.

99.     The role of the pharmaceutical distributor is not simply one of shelf stocker, freight forwarder, simple shipper, or vending machine.  A sophisticated, closed distribution system exists to move prescription drugs across the nation.  For many important reasons, this system relies upon the honesty, integrity, and accountability of distributors and pharmacies.

100.     As a distributor and dispenser of opioids, Defendants' distribution centers must operate in accordance with the statutory provisions of the CSA.  The regulations promulgated under the CSA include a requirement to design and operate a system to detect and report "suspicious orders" for controlled substances, as that term is defined in the regulation.  *See* 21 C.F.R. § 1301.74(b).  The CSA authorizes the imposition of a civil penalty of up to $10,000 for each violation of 21 C.F.R. § 1301.74(b).  *See* 21 U.S.C. § 842(a)(5) & (c)(1)(B).

101.     Congress devised the "closed" chain of distribution specifically to prevent the diversion and abuse that is complained of herein.  Under the closed-system, distributors serve as the eyes and ears of the government in identifying diversion threats.  Distributors are placed in a unique position to analyze data, which they obtain and track, regarding the amounts of prescription drugs flowing into pharmacies and facilities. They use said information to adjust quotas, forecast future sales, and report to federal and state agencies.

102.     Within this closed-system, federal law imposes specific duties upon wholesale distributors to monitor, identify, halt, and, perhaps most importantly, report "suspicious orders" of controlled substances. 21 C.F.R. § 1301.74; *Masters Pharm., Inc. v. Drug Enf't Admin.*, 861 F.3d 206 (D.C. Cir. 2017).

**VII.     Defendants Deliberately Disregarded Their Duties to Maintain Effective Controls Against Diversion.**

103.     Retail pharmacy chains earned enormous profits by flooding the country with prescription opioids.  They were keenly aware of the oversupply of prescription opioids through

the extensive data and information they developed and maintained as both distributors and retail sellers of opioids.  Yet, instead of taking any meaningful action to stem the flow of opioids into communities, they continued to participate in the oversupply and profit from it.

104.    Each Defendant does substantial business across the United States, which includes the distribution and dispensing of prescription opioids.

105.    Statewide ARCOS data confirms that the Defendants' distributed and dispensed substantial quantities of prescription opioids in the County.  In addition, they distributed and dispensed substantial quantities of prescription opioids in other states and other counties, and these drugs were diverted from these other states and counties to the County.  The Defendants' failed to take meaningful action to stop this diversion despite their knowledge of it, and thus contributed substantially to the diversion problem.

106.    The Pharmacy Defendants developed and maintained extensive data on the opioids they distributed and dispensed.  Through this data, Defendants had direct knowledge of patterns and instances of improper distribution, prescribing, sale, and use of prescription opioids in communities throughout the country, and in the County in particular.  They used the data to evaluate their own sales activities and workforce.  Defendants' also provided data regarding, *inter alia*, individual doctors to drug companies, which targeted those prescribers with their marketing, in exchange for rebates or other forms of consideration. The Defendants' data is a valuable resource that they could and should have used to help prevent diversion, but they failed to do so.  Defendants facilitated the supply of far more opioids that could have been justified to serve a legitimate market. The failure of the Defendants to maintain effective controls, and to investigate, report, and take steps to halt orders that they knew or should have known were suspicious, as well as to maintain

effective policies and procedures to guard against diversion from their retail stores, breached both their statutory and common law duties.

107.    For over a decade, Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold.  However, Defendants are not permitted to engage in a limitless expansion of their sales through the unlawful sales of regulated painkillers.

102.    Each participant in the supply chain of opioid distribution, including the Pharmacy Defendants, is responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring, and reporting suspicious activity.

103.    According to the CDC, opioid prescriptions, as measured by number of prescriptions and morphine milligram equivalent ("MME") per person, tripled from 1999 to 2015. In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the U.S. Not all of these prescriptions were legitimate.  Yet Defendants systemically ignored red flags that they were fueling a black market and failed to maintain effective controls against diversion at both the wholesale and retail pharmacy level.  Instead, they put profits over the public health and safety. Despite their legal obligations as registrants under the CSA, the Pharmacy Defendants allowed widespread diversion to occur—and they did so knowingly.

104.    Upon information and belief, this problem was compounded by the Pharmacy Defendants' failure to adequately train their pharmacists and pharmacy technicians on how to properly and adequately handle prescriptions for opioid painkillers, including what constitutes a proper inquiry into whether a prescription is legitimate and what measures and/or actions to take when a prescription is identified as potentially illegitimate.

105.    Upon information and belief, the Pharmacy Defendants also failed to put in place effective policies and procedures to prevent their stores from facilitating diversion and selling into a black market, and to conduct adequate internal or external reviews of their opioid sales to identify patterns regarding prescriptions that should not have been filled, or if they conducted such reviews, they failed to take any meaningful action as a result.

106.    Upon information and belief, even where Pharmacy Defendants enacted policies and procedures to prevent stores from facilitating diversion and selling into a black market, such policies were merely window-dressing and were not employed in any meaningful way.

107.    Upon information and belief, the Pharmacy Defendants also failed to effectively respond to concerns raised by their own employees regarding inadequate policies and procedures regarding the filling of opioid prescriptions.  Instead, Defendants put in place policies that required and rewarded speed and volume over safety and the care necessary to ensure that narcotics were distributed and sold lawfully.  Defendants consistently put profits over safety in their distribution and sale of prescription opioids.

108.    The Defendants were, or should have been, fully aware that the quantity of opioids being distributed and dispensed by them was untenable, and in many areas patently absurd. But they did not take meaningful action to investigate or to ensure that they were complying with their duties and obligations under the law with regard to controlled substances.

### a.    Defendants Have a Duty to Report Suspicious Orders and Not to Ship Those Orders Unless Due Diligence Disproves Their Suspicions

109.    Multiple sources impose duties on the Defendants to report suspicious orders and to not ship those orders unless due diligence disproves those suspicions.

110.    First, under the common law, Defendants had a duty to exercise reasonable care in delivering dangerous narcotic substances.  By flooding Oklahoma, and the County, with more

opioids than could be used for legitimate medical purposes, by filling and failing to report orders that they knew or should have realized were likely being diverted for illicit uses, and by failing to maintain effective controls against diversion from their retail stores, Defendants breached that duty and both created and failed to prevent a foreseeable risk of harm.

111.     Second, each of the Defendants assumed a duty, when speaking publicly about opioids and their efforts to combat diversion, to speak accurately and truthfully.

112.     Third, distributors and Pharmacy Defendants are required to register with the DEA to distribute and/or dispense controlled substances under the federal Controlled Substances Act. *See* 21 U.S.C. § 823(a)-(b), (e); 28 C.F.R. § 0.100; 28 C.F.R. § 1301.71.  Recognizing a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970.  The CSA and its implementing regulations created a closed-system of distribution for all controlled substances and listed chemicals.  Congress specifically designed the closed chain of distribution to prevent the diversion of controlled substances into the illicit market.  Congress was concerned with the diversion of drugs out of legitimate channels of distribution and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market."  Moreover, the closed-system was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain. All registrants must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion.  Maintaining the closed system under the CSA and effective controls to guard against diversion is a vital public health concern. Controlled substances, and prescription opioids specifically, are recognized as posing a high degree of risk from abuse and diversion.  When the supply chain participants at any level fail to

fulfill their obligations, the necessary checks and balances collapse. The result is the scourge of addiction that has occurred.

113.    As registrants, Defendants were required to "maint[ain] . . . effective controls against diversion" and to "design and operate a system to disclose . . . suspicious orders of controlled substances." 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74. Defendants were further required to take steps to halt suspicious orders. Defendants violated their obligations under federal law. Defendants have additional duties under Oklahoma's controlled substances laws and common law.

114.    Further, under the CSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." *See* 21 C.F.R. § 1301.71(a). In addition, 21 C.F.R. § 1306.04(a) states, "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." Thus, regardless of whether they are registrants, all dispensers must ensure that prescriptions of controlled substances are "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). The DEA has recognized that "as dispensers of controlled substances, pharmacists and pharmacy employees are often the last line of defense in preventing diversion."[25]

115.    "A prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice." 21 C.F.R. § 1306.06. As the Department of Justice's recent lawsuit against Walmart alleges, 21 C.F.R. § 1306.06 requires that a pharmacist's conduct, when filling controlled-substance prescriptions adhere to the usual course

---

[25] *See* 2012 Dear Registrant letter to pharmacy registrants at http://ppsconline.com/articles/2012/FL_PDAC.pdf

of a pharmacist's professional practice.  The obligation to identify any red flags relating to a controlled-substances prescription, to resolve them before filing the prescription, and to document any resolution of red flags is a well-recognized responsibility of a pharmacist in the professional practice of pharmacy.  *United States of America v. Walmart Inc. et al.*, 1:20-cv-01744, (D. Del. Dec. 22, 2020).

116.     Under the CSA, the duty to prevent diversion lies with the Pharmacy Defendants', not the individual pharmacist.  As such, although it acts through its agents, the pharmacy is ultimately responsible to prevent diversion, as described above.[26]  Further, as described above, the obligations under the controlled-substances laws extend to any entity selling prescription opioids, whether it is the registration holder or not.  It is unlawful for any person knowingly to distribute or dispense controlled substances other than in accordance with the requirements of the federal CSA and its implementing regulations, or in violation of state-controlled substances laws and regulations. Pharmacy Defendants are responsible "persons" under the CSA.  They also exert control over their agents, including the responsibility to ensure they comply with applicable laws and regulations in all dispensing of controlled substances.  Pharmacy chains cannot absolve themselves of their own obligations by attempting to place unilateral responsibility on their agents.

117.     In addition to their duties as distributors, the Defendant Pharmacies also had a duty to design and implement systems to prevent diversion of controlled substances in their retail pharmacy operations.  Defendants had the ability, and the obligation, to look for these red flags on

---

[26] *The Medicine Shoppe; Decision and Order*, 79 FR 59504, 59515 (DEA Oct. 2, 2014)  (emphasis added); *see also Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*; Decision and Order, 77 FR 62316-01 ("When considering whether a pharmacy has violated its corresponding responsibility, the Agency considers whether the entity, not the pharmacist, can be charged with the requisite knowledge."); *Top RX Pharmacy*; Decision and Order, 78 FR 26069, 62341 (DEA Oct. 12, 2012) (same); *cf. Jones Total Health Care Pharmacy LLC and SND Health Care LLC v. Drug Enforcement Administration*, 881 F.3d 82 (11th Cir. 2018) (revoking pharmacy registration for, *inter alia*, dispensing prescriptions that prescriptions presented various red flags, i.e., indicia that the prescriptions were not issued for a legitimate medical purpose without resolving red flags).

a patient, prescriber, and store level, and to refuse to fill and to report prescriptions suggestive of potential diversion. They also have a crucial role in creating chain-wide systems to identify and avoid filling "prescriptions" that are not issued for a legitimate purpose or by a prescriber with a valid, current license.

118.    Pharmacy Defendants' obligations extend to monitoring, and documenting, the steps they take in accessing state prescription drug monitoring programs, often referred to as "PDMPs." Yet, the Chain Pharmacies, upon information and belief, generally relied on their pharmacists' discretion in this area rather than setting forth requirements concerning PDMP searches and implementing systems, at least for many years, to track and document PDMP searches and their results.

119.    The CSA requires distributors and pharmacies, along with other participants in the supply chain of controlled substances like opioids to: (a) limit sales within a quota set by the DEA for the overall production of controlled substances like opioids; (b) register to distribute opioids; (c) maintain effective controls against diversion of the controlled substances that they manufacture or distribute; and (d) identify suspicious orders of controlled substances and halt such sales.

120.    To ensure that even drugs produced within quota are not diverted, federal regulations issued under the CSA mandate that all registrants "design and operate a system to disclose to the registrant suspicious orders of controlled substances." 21 C.F.R. § 1301.74(b). Registrants are not entitled to be passive (but profitable) observers, but rather "shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant." *Id*. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency. *Id*. Other indicia of potential diversion may include, for example, "[o]rdering the same controlled substance from multiple distributors."

121.     These criteria are disjunctive and are not all inclusive.  For example, if an order deviates substantially from a normal pattern, the size of the order does not matter, and the order should be reported as suspicious.  Likewise, a distributor need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious.  The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the responsibility to report the order as suspicious.  The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the customer base and the patterns throughout the relevant segment of the industry. For this reason, identification of suspicious orders serves also to identify excessive volume of the controlled substance being shipped to a particular region.

122.     Of course, due diligence efforts must also be thorough: "the investigation must dispel all red flags indicative that a customer is engaged in diversion to render the order non-suspicious and exempt it from the requirement that the distributor inform the DEA about the order. Put another way, if, even after investigating the order, there is any remaining basis to suspect that a customer is engaged in diversion, the order must be deemed suspicious, and the Agency must be informed.  Indeed, the DEA may revoke a distributor's certificate of registration as a vendor of controlled substances if the distributor identifies orders as suspicious and then ships them without performing adequate due diligence.

123.     To comply with the law, wholesale distributors, including Defendants, must know their customers and the communities they serve.  Each distributor must "perform due diligence on its customers" on an "ongoing [basis] throughout the course of a distributor's relationship with its customer." *Masters Pharms., Inc.*, 80 Fed. Reg. 55,418, 55,477 (DEA Sept. 15, 2015), *petition for review denied*, 861 F.3d 206 (D.C. Cir. 2017).

124.     Pharmacy order data provides detailed insight into the volume, frequency, dose, and type of controlled and non-controlled substances a pharmacy typically orders.  This includes non-controlled substances and Schedule IV controlled substances (such as benzodiazepines), which are not reported to the DEA, but whose use with opioids can be indicative of diversion.

125.     As acknowledged in an article CVS published in the New England Journal of Medicine, "[p]harmacies have a role to play in the oversight of prescriptions for controlled substances, and opioid analgesics in particular."  Mitch Betses, R.Ph., and Troyen Brennan, M.D., M.P.H., *Abusive Prescribing of Controlled Substances - A Pharmacy View*, N. ENGL. J. MED. 369;11, Sept. 12., 2013, at 989-991.  The DEA has identified "both pharmaceutical distributors and chain pharmacies as part of the problem" contributing to opioid abuse and related deaths. *Id.* The Chain Pharmacies have a particular "advantage" in meeting their obligations under the CSA because these entities can use "aggregated information on all prescriptions filled at the chain" in order to examine "patterns" of opioids and other "high-risk drugs" and target "inappropriate prescribing."  *Id.* at 990.  For example, a chain pharmacy should properly use its chainwide dispensing data to identify "high risk prescribers" by "benchmarking" prescription data based on "several parameters," including "volume of prescriptions for high-risk drugs," "the proportion of the prescriber's prescriptions that were for such [high-risk] drugs, as compared with the volume and proportion for others in the same specialty and region," cash payment, ages of patients, and the prescriber's ratio of "prescriptions for noncontrolled substances with prescriptions for controlled substances." *Id.*  This "[a]nalysis of aggregated data" from chain pharmacies can "target patterns of abuse," in the face of "the growing use of controlled substances and resulting illnesses and deaths."  *Id.*  Accordingly, as CVS touts, "innovative use of transparent data is only prudent." *Id.*

126.     As CVS counseled, Defendants may not ignore red flags of illegal conduct and must use the information available to them to identify, report, and not fill prescriptions that seem indicative of diversion.  That would include reviewing their own data, relying on their observations of prescribers, pharmacies, and customers, and following up on reports or concerns of potential diversion.

127.     In addition to their duties as distributors, Pharmacy Defendants also had a duty to monitor and report suspicious activity in their retail pharmacy operations.  Specifically, Defendants had a duty to analyze data and store-level information for known red flags such as (a) multiple prescriptions to the same patient using the same doctor; (b) multiple prescriptions by the same patient using different doctors; (c) prescriptions of unusual size and frequency for the same patient; (d) orders from out-of-state patients or prescribers; (e) an unusual or disproportionate number of prescriptions paid for in cash; (f) prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose.

128.     The CSA also imposes important record-keeping obligations on pharmacies, including pharmacy chains.  "[E]very registrant . . . dispensing a controlled substance or substances shall maintain, on a current basis, a complete and accurate record of each such substance . . . received, sold, delivered, or otherwise disposed of by him."  21 USC 827(a).  "[A] registrant's accurate and diligent adherence to [its recordkeeping] obligations is absolutely essential to protect against the diversion of controlled substances."  Paul H. Volkman, 73 FR 30,630, 30,644 (2008).  An important component of an anti-diversion system is the documentation Pharmacy Defendants possess.  They must utilize their information to identify patterns of diversion and for auditing,

training, and investigation of suspicious activity in an effort to prevent diversion of controlled substances.

129.    According to law and industry standards, if a pharmacy finds evidence of prescription diversion, the Board of Pharmacy and DEA must be contacted.

130.    As distributors and as pharmacies, Defendants have a duty, and are expected, to be vigilant in ensuring that controlled substances are delivered only for lawful purposes.

131.    State and federal statutes and regulations reflect a standard of conduct and care below which reasonably prudent distributors and pharmacies would not fall.  Together, these laws and industry guidelines make clear that Defendants possess and are expected to possess, specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription opioids and of the risks and dangers of the diversion of prescription opioids when the supply chain is not properly controlled.

132.    Further, these laws and industry guidelines make clear that Defendants have a responsibility to exercise their specialized and sophisticated knowledge, information, skill, and understanding to prevent the oversupply of prescription opioids and minimize the risk of their diversion into an illicit market.

133.    The privilege of holding a license to distribute and dispense controlled substances comes with the responsibility of ensuring that the controlled substances distributed or sold are not diverted and/or subject to abuse and misuse.  State and federal laws also have developed fairly uniform standards of practice across the country.  It is both intuitive and understood that selling drugs for non-medical purposes, or drugs which the dispenser knows or should know present a significant risk for diversion falls outside the standards of care and is not a legitimate practice.  As

part of usual and customary practice, prescriptions must be evaluated and determined to be valid and issued for a legitimate medical purpose.

134.     Pharmacies' evaluation process includes with what is known as "Drug Utilization Review" or "DUR."  This practice is both part of traditional roles and duties and codified in federal and state statutes.  Notably, during the rulemaking practice for one authority, the Omnibus Budget [R]econciliation Act of 1990 (OBRA 90), a commenter suggested that instructions for compliance with prospective DUR should go to the pharmacist and not the pharmacy.  In response, the government stated that "the instructions for compliance with prospective DUR should be directed to the pharmacies," and that "[t]he owners or managers of pharmacies, as Medicaid providers, are responsible for furnishing their staff with information pertaining to DUR."  States, seeking to assure uniformity, have taken action to require the same mandates as this federal law.  The DUR process includes looking at over-utilization, drug interactions and identifying abuse and misuse of dangerous drugs such as opioids.  This process would have provided the Defendants information about potential diversion as well.

135.     Accordingly, states, including Oklahoma, revised and expanded practice acts and rules and increased their support for, and reliance on, Prescription Drug Monitoring Programs (PDMPs) such as the Oklahoma Prescription Monitoring Program (PMP).

136.     Defendants themselves recognized the value of the tools available to them through PMDPs. An internal CVS document, for example, characterized PDMPs as an "invaluable tool for Pharmacists to prevent controlled substances from being diverted or dispensed for non-medical purposes …." It also described PDMPs as "cut[ting] down on prescription fraud and 'doctor shopping' by providing Prescribers and Pharmacists with more complete information about a

patient's controlled substance prescription history." Separately, data also suggests that PDMP utilization assists in detecting possible misuse and diversion of controlled substances.

137.    Additionally, Pharmacy Defendants have operating systems and methods to store and retain prescription dispensing data and records.  The information they possess must be readily retrievable, and they have an obligation to use it to identify patterns of diversion, conduct internal audits and training programs, investigate suspicious prescribers, patients, and pharmacists, and prevent diversion of controlled substances.  Their hiring, training, and management of pharmacy personnel, and their supporting policies, procedures, and systems should and must promote public health and safety and assist in the identification and prevention of the diversion of controlled substances.

### c.    <u>Defendants Were Aware of and Have Acknowledged Their</u> Obligations to <u>Prevent Diversion and to Report and Take Steps to</u> Halt Suspicious Orders.

138.    The DEA has repeatedly affirmed the obligations of pharmacies to maintain effective controls against diversion in regulatory action after regulatory action.[27]  The DEA, among others, also has provided extensive guidance to pharmacies on how to identify suspicious orders and other evidence of diversion.

139.    The DEA has repeatedly emphasized that retail pharmacies, such as Defendants, are required to implement systems that detect and prevent diversion and must monitor for and report red flags of diversion.  When red flags appear, the pharmacy's "corresponding responsibility" under 21 C.F.R. § 1306.04(a) requires it either to take steps (and document those

---

[27] *See, e.g.*, Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195; 77 Fed. Reg. 62,316 (DEA Oct. 12, 2012) (decision and order); East Main Street Pharmacy, 75 Fed. Reg. 66,149 (DEA Oct. 27, 2010) (affirmance of suspension order); Holiday CVS, L.L.C. v. Holder, 839 F.Supp.2d 145 (D.D.C. 2012); Townwood Pharmacy; 63 Fed. Reg. 8,477 (DEA Feb. 19, 1998) (revocation of registration); Grider Drug 1 & Grider Drug 2; 77 Fed. Reg. 44,069 (DEA July 26, 2012) (decision and order); The Medicine Dropper; 76 Fed. Reg. 20,039 (DEA April 11, 2011) (revocation of registration); Medicine Shoppe-Jonesborough; 73 Fed. Reg. 363 (DEA Jan. 2, 2008) (revocation of registration).

steps) to resolve the issues or else to refuse to fill prescriptions with unresolvable red flags.[28]  DEA has identified several types of "unresolvable red flags" which, when present in prescriptions presented to a pharmacist, may never be filled by the overseeing pharmacist.  These unresolvable red flags include: a prescription issued by a practitioner lacking valid licensure or registration to prescribe the controlled substances; multiple prescriptions presented by the same practitioner to patients from the same address; prescribing the same controlled substances in each presented prescription; a high volume of patients presenting prescriptions and paying with cash; and, a prescription presented to by a customer who has traveled significant and unreasonable distances from their home to see a doctor and/or to fill the prescription at the pharmacy.

140.     DEA guidance also instructs pharmacies to monitor for red flags that include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances as compared to other practitioners in the area, and (2) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time.  Most of the time, these attributes are not difficult to detect and should be easily recognizable by Defendants' diversion control systems.

141.     Pharmacies must resolve red flags before a prescription for addictive and dangerous drugs, such as opioids, are dispensed.

### c.     Defendants Were Uniquely Positioned to Guard Against Diversion

142.     Not only do Chain Pharmacies often have firsthand knowledge of dispensing red flags – such as distant geographic location of doctors from the pharmacy or customer, lines of seemingly healthy patients, cash transactions, and other significant information – but they also

---

[28] *See Pharmacy Doctors Enterprises, Inc. v. Drug Enf't Admin.*, No. 18-11168, 2019 WL 4565481, at *5 (11th Cir. Sept. 20, 2019).

have the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores. As with other distributors, these data points give the Pharmacy Defendants' insight into prescribing and dispensing conduct that enables them to prevent diversion and fulfil their obligations under the CSA.

143.     Pharmacies not only make observations through their local front doors but have extensive data to which an individual pharmacist would not have access.  They are uniquely positioned to monitor, for example, the volume of opioids being dispensed in their pharmacies relative to the size of the communities they serve.  This is particularly important given that it is recognized that as to the supply of opioids increases, so does the incidence of over-dose and death.  They could also use this information to monitor potentially suspicious prescribers.  Pharmacies must use the information available to them to guard against supplying controlled substances for non-medical use, identify red flags or potential diversion and should share this information with their agents, as well as provide clear guidance and training on how to use it.  As explained above, in addition to their duties as distributors, the Pharmacy Defendants also had a duty to design and implement systems to prevent diversion of controlled substances in their retail pharmacy operations.  Specifically, the Defendants had a duty to analyze data and the personal observations of their employees for known red flags such as those described above.  The Defendants had the ability, and the obligation, to look for these red flags on a patient, prescriber, store, and chain level, and to refuse to fill and to report prescriptions that appeared suspicious.

144.     As explained above, in addition to their duties as distributors, the Pharmacy Defendants also had a duty to design and implement systems to prevent diversion of controlled substances in their retail pharmacy operations.  Specifically, the Defendants had a duty to analyze data and the personal observations of their employees for known red flags such as those described

above.  The Pharmacy Defendants had the ability, and the obligation, to look for these red flags on a patient, prescriber, store, and chain level, and to refuse to fill and to report prescriptions that suggested potential diversion

145.    They were particularly well-positioned to do so given the dispensing data available to them, which they could review at the corporate level to identify patterns of diversion and to create policies and practices to proactively identified patterns of diversion. Each could and should have also developed tools and programs to alert their pharmacists to red flags and to guard against diversion.

146.    As described above and further below, the Pharmacy Defendants also possessed sufficiently detailed and valuable information that other companies were willing to pay them for it.  In 2010, for example, Walgreen's fiscal year 2010 SEC Form 10-K disclosed that it recognizes "purchased prescription files" as "intangible assets" valued at $749,000,000.[29]  In addition, Walgreens's own advertising has acknowledged that Walgreens has centralized data such that customers' "complete prescription records" from Walgreens's "thousands of locations nationwide" are *"instantly available."*

147.    Similarly, CVS's Director of Managed Care Operations, Scott Tierney, testified that CVS's data vendors included IMS Health, Verispan, and Walters Kluwers and that CVS used the vendors for "analysis and aggregation of data" and "some consulting services." He also testified that CVS would provide the vendors with "prescriber level data, drug level data, plan level data, [and] de-identified patient data."[30]

---

[29] *See* https://www.sec.gov/Archives/edgar/data/104207/000010420710000098/exhibit_13.htm
[30] Joint Appendix in *Sorrell v. IMS Health Inc.*, No. 10-779, 2011 WL 687134 (U.S.) *245-46 (Feb. 22, 2011).

148.     Each of the Pharmacy Defendants had complete access to all prescription opioid dispensing data related to its pharmacies in the County, complete access to information revealing the doctors who prescribed the opioids dispensed in its pharmacies in and around the County, and complete access to information revealing the customers who filled or sought to fill prescriptions for opioids in its pharmacies in and around the County.  Further, each of the Pharmacy Defendants had complete access to information revealing the geographic location of out-of-state doctors whose prescriptions for opioids were being filled by its pharmacies in and around the County and complete access to information revealing the size and frequency of prescriptions written by specific doctors across its pharmacies in and around the County.

### d.   Defendants Failed to Maintain Effective Controls Against Diversion in the County.

149.     As described further below, the Pharmacy Defendants failed to fulfill their legal duties and instead, routinely distributed and/or dispensed controlled substances while ignoring red flags of diversion and abuse.  The unlawful conduct by the Defendants is a substantial cause for the volume of prescription opioids and the public nuisance plaguing the County.

### i.   WALGREENS

150.     As described above and further below, as both a distributor and a dispenser, Walgreens ignored indicia of diversion in Oklahoma and the County.

151.     Walgreens violated the standard of care for a distributor by failing to:  (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

152.     The volume of opioids Walgreens shipped into, and dispensed from locations surrounding the County was so high as to raise a red flag that not all of the opioid prescriptions being ordered could be for legitimate medical uses.

153.     Upon information and belief, Walgreens funneled far more opioids into Oklahoma than could have been expected to serve legitimate medical uses and ignored other indicia of suspicious orders. This information, along with the information known only to distributors such as Walgreens (especially with its pharmacy dispensing data), would have alerted Walgreens to potential diversion of opioids.

154.     In addition, Walgreens also distributed and dispensed substantial quantities of prescription opioids in other states, and these drugs were diverted from these other states to Oklahoma. Walgreens failed to take meaningful action to stop this diversion despite its knowledge of it, and it contributed substantially to the opioid epidemic in Oklahoma, and the County.

155.     Walgreens also developed and maintained highly advanced data collection and analytical systems.  These sophisticated software systems monitor the inventory and ordering needs of customers in real-time and depicted the exact amounts of pills, pill type, and anticipated order threshold for its own stores.

156.     Through this proprietary data, Walgreens had direct knowledge of patterns and instances of improper distribution, prescribing, and use of prescription opioids in Oklahoma.  It used this data to evaluate its own sales activities and workforce.  Walgreens also was in possession of extensive data regarding individual doctors' prescribing and dispensing to its customers, the percentage of a prescriber's prescriptions that were controlled substances, individual prescription activity across all Walgreens stores, and the percentages of prescriptions purchased in cash.  Such data are a valuable resource that Walgreens could have used to help stop diversion, but it did not.

157.     Walgreens, by virtue of its data analytics, was actually aware at a corporate level of indicia of diversion, such as (1) individuals traveling long distances to fill prescriptions; (2) prescriptions for drug "cocktails," known for their abuse potential, such as oxycodone and Xanax; (3) individuals who arrived together with identical or nearly identical prescriptions; (4) high percentage of cash purchases; and (5) doctors prescribing outside the scope of their usual practice or geographic area.  However, Walgreens failed to effectively make the data demonstrating these obvious flags available to its pharmacists and failed to properly address the red flag dispensing patterns.

158.     Walgreens also failed to adequately use data available to it to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts or doses of opioids, or to adequately use data available to it to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis.  While Walgreens periodically implemented programs that would identify the most suspicious prescribers, it failed to make this data readily available to its pharmacists, and either terminated or failed to act on them at the corporate level.

159.     Upon information and belief, Walgreens failed to adequately analyze and address its opioid sales relative to: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

160.     Walgreens failed to adequately analyze and address its opioid sales relative to: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.  With the information available to it,

Walgreens thus knew which pharmacists filled more controlled substances prescriptions that others, however, Walgreens failed to meaningfully act to curtail red flag dispensing.

161.    Upon information and belief, based on other enforcement actions against the company, Walgreens also failed to adequately analyze and address its opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if it conducted such reviews, it failed to take any meaningful action as a result.

162.    Discovery will reveal that Walgreens knew or should have known that its pharmacies in Oklahoma, and the surrounding area, were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash  (f)  filling  prescriptions  paired  with other  drugs  frequently  abused  with  opioids,  like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse. Also, upon information and belief, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to non-controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets. Walgreens had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

ii.    **WAL-MART**

41

163.     According to data from the ARCOS database, between 2006 and 2014, Walmart distributed more than *2.2 million* dosage units of oxycodone and hydrocodone into the County. The volume of opioids Walmart brought into the County—and then sold from just one Walmart pharmacy location in the County—was so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical uses.

164.     Yet, upon information and belief, Walmart did not report a single suspicious order in the County between 2007 and 2014.  Instead, Walmart funneled far more opioids into Oklahoma and the County than could have been expected to serve legitimate medical use and ignored other red flags of suspicious orders.  This information, along with the information known only to distributors such as Walmart (especially with its pharmacy dispensing data), would have alerted Walmart to potential diversion of opioids.

165.     In addition, Walmart, upon information and belief, also distributed and dispensed substantial quantities of prescription opioids in other states, and these drugs were diverted from these other states to Oklahoma.  Walmart failed to take meaningful action to stop this diversion despite its knowledge of it, and it contributed substantially to the opioid epidemic in Oklahoma, and the County.

166.     In the County, Walmart violated the standard of care for a distributor by failing to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

167.     For years, per capita opioid prescriptions in the County far exceeded the national average and increased in ways that should have alerted Walmart to potential diversion.  As a vertically integrated, national retail pharmacy chain, Walmart had the ability to detect diversion in

ways third-party wholesale distributors could not by examining the dispensing data from their own retail pharmacy locations.

168.     Given the volume and pattern of opioids distributed in Oklahoma and in the County, Walmart was, or should have been aware that opioids were being oversupplied into the state and should have detected, reported, and rejected suspicious orders.

169.     Upon information and belief, Walmart, by virtue of the dispensing data available to it, had actual knowledge of indicia of diversion, such as (1) individuals traveling long distances to fill prescriptions; (2) prescriptions for drug "cocktails" known for their abuse potential, such as oxycodone and Xanax; (3) individuals arriving together with identical or nearly identical prescriptions; (4) high percentage of cash purchases; and (5) doctors prescribing outside the scope of their usual practice or geographic area.  However, Walmart ignored these obvious red flags.

170.     Walmart, therefore, was aware of the suspicious orders that flowed from its distribution facilities.  Walmart refused to identify, investigate, and report suspicious orders despite its actual knowledge of drug diversion.  Rather, upon information and belief, Walmart failed to report suspicious orders, prevent diversion, or otherwise control the supply of opioids flowing into Oklahoma and the County.

171.     Upon information and belief, Walmart failed to analyze: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

172.     Walmart was, or should have been, fully aware that the opioids being distributed and dispensed by it were likely to be diverted; yet, it did not take meaningful action to ensure that it was complying with its duties and obligations with regard to controlled substances, including its

responsibility to report suspicious orders and not to ship such orders unless and until due diligence allayed the suspicion.

173.    Given Walmart's retail pharmacy operations, in addition to its role as a wholesale distributor, Walmart knew or reasonably should have known about the disproportionate flow of opioids into Oklahoma and the County and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for, if not direct evidence of, diversion.

174.    Discovery will reveal that Walmart knew or should have known that its pharmacies in Oklahoma, and the surrounding area, were:  (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse.  Also, upon information and belief, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to non-controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets.  Walmart had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

175.    Walmart had complete access to all prescription opioid distribution data related to Walmart pharmacies in and around the County.

176.     Walmart had complete access to all prescription opioid dispensing data related to Walmart pharmacies in and around the County.

177.     Walmart had complete access to information revealing the doctors who prescribed the opioids dispensed in Walmart pharmacies in and around the County.

178.     Walmart had complete access to information revealing the customers who filled or sought to fill prescriptions for opioids in Walmart pharmacies in and around the County.

179.     Walmart had complete access to information revealing the opioids prescriptions dispensed by Walmart pharmacies in and around the County.

180.     Walmart had complete access to information revealing the geographic location of out-of-state doctors whose prescriptions for opioids were being filled by Walmart pharmacies in and around the County.

181.     Walmart had complete access to information revealing the size and frequency of prescriptions written by specific doctors across Walmart pharmacies in and around the County. Yet, on information and belief, Walmart also failed to adequately analyze and address its opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if it conducted such reviews, it failed to take any meaningful action as a result.

**iii.    CVS**

182.     As a vertically integrated distributor and dispenser of prescription opioids, CVS knew or should have known that an excessive volume of pills was being sold into Oklahoma and ultimately, onto the streets of Craig County.  CVS's activities as a distributor and a seller or dispenser of opioids are inextricably linked.

183.     CVS violated the standard of care for a distributor by failing to:  (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

184.     It cannot be disputed that CVS was aware of the suspicious orders that flowed from its distribution facilities into its own stores.  Upon information and belief,  CVS simply refused to identify, investigate, and report suspicious orders even though CVS knew, or should have been fully aware, that opioids it distributed and sold were likely to be diverted.  Conversely, upon information and belief CVS failed to report suspicious orders, failed to meaningfully investigate or reject suspicious orders, and failed to prevent diversion, or otherwise control the supply of opioids flowing into Oklahoma and the County.

185.     Upon information and belief, CVS failed to analyze: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

186.     CVS was, or should have been, fully aware that the opioids being distributed and dispensed by it were likely to be diverted.  Yet it did not take meaningful action to investigate or to ensure that it was complying with its duties and obligations with regard to controlled substances, including its responsibility to report suspicious orders and not to ship such orders unless and until due diligence allayed the suspicion.

187.     Given CVS's retail pharmacy operations, in addition to its role as a wholesale distributor, CVS knew, or reasonably should have known, about the disproportionate flow of opioids into Oklahoma and the County.

188.     In addition, CVS knew, or deliberately turned a blind eye to, its pharmacies' role in diversion of dangerous opioids.  At the pharmacy level, discovery will reveal that CVS knew, or should have known, that its pharmacies in Oklahoma, and the surrounding area, were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse.  CVS had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

189.     Upon information and belief, CVS failed to use data held at the corporate level to assist pharmacists in evaluating red flags of diversion.

190.     Because of its vertically integrated structure, CVS has access to complete information regarding red flags of diversion across its pharmacies in and around the County, but CVS chose not to utilize this information and failed to effectively prevent diversion.

   **VIII.  Oklahoma-Specific Facts:**

   a.     **Defendants Breached Their Duties in Oklahoma and the County.**

191.     The Pharmacy Defendants distributed and dispensed opioids in Oklahoma and failed to meet their regulatory obligations while doing so.

192.    In addition to the duties imposed by federal law, under Oklahoma law, those who distribute opioids have a duty to detect, investigate, refuse to fill or ship, and report suspicious orders of opioids.  And pharmacies who dispense opioids are required to refuse to fill and report prescriptions that have indicia of diversion as well.

193.    To that end, the Oklahoma Administrative Code requires that drug wholesalers, "shall maintain inventories and records of controlled substances." OK ADC § 475:25-1-4(b).  In addition, the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control ("OBN") Administrative Rules requires that drug wholesalers "shall design and operate a system to disclose to the registrant suspicious orders of controlled dangerous substances and shall inform the OBN of suspicious orders when discovered by the registrant." OK ADC § 475:20-1-5(b); *accord* 21 U.S.C. § 823 (mandating that registration be consistent with the public interest, which, in turn, requires "maintenance of effective controls against diversion . . . into other than lawful medical, scientific, or industrial channels" and "compliance with applicable State and local law"); 21 C.F.R. § 1301.74 (imposing duty to monitor, detect, investigate, refuse to fill, and report suspicious orders under federal law).

194.    Oklahoma regulations further mandate that, "The registrant shall inform the OBN of suspicious orders when discovered by the registrant.  Suspicious orders include suspicious orders, defined as orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." OK ADC § 475:20-1-5(b).  Distributors also have a duty to know their customers and the communities they serve.  To the extent that, through due diligence a distributor observes suspicious circumstances—such as cash transactions or young and seemingly healthy patients filling prescriptions for opioids at a pharmacy they supply—those observations can also trigger reasonable suspicion.  A single order can warrant scrutiny, or it may be a pattern

of orders, or an order that is unusual given the customer's history or its comparison to other customers in the area.

195.    Defendants were required by Oklahoma law to operate in compliance with federal laws, including the federal Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.* and its implementing regulations. *See* OK ADC § 535:20-7-7-10 et al., (mandating that "A wholesale distributor shall operate in compliance with applicable federal, state, and local laws and regulations, including, but not limited to, the Drug Supply Chain Security Act of 2013 and the rules promulgated thereunder and the Act, 59 O.S. § 353 et seq., and the Board rules, OAC 535.").

102.    As pharmacies, Defendants also have independent duties under Oklahoma law. The Oklahoma Administrative Code imposes obligations and duties upon "applicants" and "registrants," to "provide effective controls and procedures to guard against theft and diversion of controlled dangerous substances." OK ADC § 475:20-1-2(a). Obligations extend to wholesalers and pharmacies alike.

196.    Under the Oklahoma Administrative Code "a prescription for a controlled dangerous substance to be effective must be issued for a legitimate medical purpose by a registered or otherwise authorized individual practitioner acting in the usual course of his/her professional practice. The responsibility for the proper prescribing and dispensing of controlled dangerous substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription, as the filling of a prescription is not incumbent on the pharmacy.    An order purporting to be  a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of Title 63 Okl. St. Ann. §§ 2-309 and 2-312, and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties

49

provided for violations of the provisions of law relating to controlled dangerous substances."  OK ADC. § 475:30-1-3.

197.     Although they act through their agents, the Pharmacy Defendants, as the registrants, are ultimately responsible to prevent diversion, as described above.

198.     Thus, in addition to their duties as distributors, the Pharmacy Defendants also had a duty to design and implement systems to prevent diversion of controlled substances in their retail pharmacy operations.  The Defendants had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

199.     The Pharmacy Defendants knew, or should have known, that their pharmacies in Oklahoma, and the surrounding area, were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, like benzodiazepines, or prescription "cocktails"; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse.  The Defendants had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

200.     The Pharmacy Defendants were either on notice, or should have been on notice, that the diversion of opioids was likely occurring in Oklahoma communities, should have investigated, ceased filling orders for opioids, and reported potential diversion.

201.     The Pharmacy Defendants had information about suspicious orders that they did not report, and also failed to exercise due diligence before filling orders from which opioids were diverted into illicit uses in communities across Oklahoma and the County.

### b. Statutes Of Limitations Are Tolled and Defendants Are Estopped From Asserting Statutes Of Limitations As Defenses.

#### 1. Continuing Conduct

202.     The County continues to suffer harm from the unlawful actions by the Defendants.

203.     The continued tortious and unlawful conduct by the Pharmacy Defendants causes a repeated or continuous injury.  The damages have not occurred all at once but have continued to occur and have increased as time progresses.  The tort is not completed nor have all the damages been incurred until the wrongdoing ceases.  The wrongdoing and unlawful activity by the Defendants' have not ceased.  The public nuisance remains unabated.  The conduct causing the damages remains unabated.

#### 2. Equitable Estoppel and Fraudulent Concealment

204.     The Pharmacy Defendants are also equitably estopped from relying upon a statute of limitations defense because they undertook active efforts to deceive the County and to purposefully conceal their unlawful conduct and fraudulently assure the public, including the County, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered distributor and/or dispenser status and to continue generating profits.  Notwithstanding the allegations set forth

above, the Pharmacy Defendants affirmatively assured the public, including the County, that they are working to curb the opioid epidemic.

205.    Seeking to convince the public that their legal duties to report suspicious sales had been satisfied through public assurances that they were working to curb the opioid epidemic.  They publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways insisting they were good corporate citizens.  These repeated misrepresentations misled regulators, prescribers and the public, including the County, and deprived the County of actual or implied knowledge of facts sufficient to put the County on notice of potential claims.

206.    The County did not discover the nature, scope and magnitude of the Chain Pharmacies' misconduct, and its full impact on the County, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

207.    The Pharmacy Defendants intended that their actions and omissions would be relied upon, including by the County.  The County did not know and did not have the means to know the truth, due to the Defendants' actions and omissions.

208.    The County reasonably relied on the Pharmacy Defendants affirmative statements regarding their purported compliance with their obligations under the law.

## CAUSE OF ACTION

### COUNT I
### PUBLIC NUISANCE IN VIOLATION OF 50 OKLA. STAT. 2011 §§ 1&2
### (ALL DEFENDANTS)

209.    Plaintiff incorporates by reference the allegations in paragraphs 1 through 208.

210.     Oklahoma's nuisance statute codifies the common law and states, "A nuisance consists in unlawfully doing an act, or omitting to perform a duty, which act or omission either: First: Annoys, injures or endangers the comfort, repose, health, or safety of others; or Second: Offends decency; or Third: Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake or navigable river, stream, canal or basin, or any public park, square, street or highway; or Fourth: In any way renders other persons insecure in life, or in the use of property…"  50 O.S. 2011 § 1; *See State ex rel. Hunter v. Johnson & Johnson*, 2021 OK 54, 499 P.3d 719, November 9, 2021; citing *Nichols v. Mid-Continent Pipe Line Co.,* 1996 OK 118, ¶ 8, 933 P.2d at 276.

211.     A public nuisance is one which affects at the same time an entire community or neighborhood, or a considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal.  50 Okl. St. Ann. § 2; *State ex rel Field v. Hess*, 540 P.2d 1165, 1170 (Okla. 1975).  A private person may maintain an action for a public nuisance if it is specially injurious to himself but not otherwise.  *Schlirf v. Loosen.*, 232 P.2d 928, 930 (Okla. 1951).

212.     Each Defendant is liable for public nuisance because each Defendant's conduct described herein caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of, and/or substantial factor leading to, Plaintiff's harm, inconvenience, or damage.

213.     Defendants, individually and acting through their employees and agents, have created and continue to perpetuate and maintain the public nuisance to the residents of Craig County through the massive distribution and dispensing of millions of doses of highly addictive and commonly abused prescription opioids.  By causing dangerously addictive drugs to flood the

community and to be diverted for illicit purposes, in contravention of federal and state law, each Defendant injuriously affected rights common to the general public, specifically including the rights of the people of Plaintiff's community, to public health, public safety, public peace, public comfort, and public convenience.  The public nuisance caused by Defendants' acts and omissions has caused substantial annoyance, inconvenience, and injury to the public.

214.     As distributors, Defendants failed to put in place effective controls and procedures to guard against theft and diversion of opioids; to adequately design and operate a system to disclose suspicious orders of opioids; and to report suspicious orders when suspected or discovered.

215.     By failing to maintain a closed distribution system that guards against diversion of dangerously addictive drugs for illicit purposes, Defendants injuriously affected rights common to the general public, specifically including the rights of the people of Plaintiff's community, to public health, public safety, public peace, public comfort, and public convenience.

216.     Oklahoma statute states that knowingly causing or permitting a condition to exist which injures or endangers the public health, safety, or welfare constitutes a nuisance and is a crime.  21 OKLA. STAT. § 1191.

217.     Through the acts described herein, Defendants intentionally and/or unlawfully created a public/common nuisance.

218.     The residents of Plaintiff's community have a common right to be free from conduct that creates an unreasonable jeopardy to the public health, welfare, and safety, and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

219.    Defendants intentionally, unlawfully, and recklessly distributed, and dispensed prescription opioids that Defendants knew, or reasonably should have known, would be diverted, causing widespread distribution of highly dangerous and addictive prescription opioids in and/or to Plaintiff's community, which resulted in addiction and abuse, an elevated level of crime, death and injuries to the residents of Plaintiff's community, and direct costs to Plaintiff's community.

220.    Defendants unlawfully and/or intentionally caused and permitted dangerous opioids under their control to be diverted, which caused injury to the Plaintiff's community and its residents.

221.    Defendants unlawfully and/or intentionally distributed and dispensed opioids or caused opioids to be distributed and/or dispensed without maintaining effective controls against diversion.  Defendants' failures in this regard include Defendants' failure to effectively monitor for suspicious orders, report suspicious orders, and/or stop shipment of suspicious orders.  Such conduct was illegal.

222.    Defendants' actions have been of a continuing nature and have produced a significant and continuing effect upon the public's rights, including the public's right to health and safety.  The opioids illegally distributed and dispensed in Plaintiff's Community have and will be diverted, leading to abuse, addiction, crime, and public health costs.

223.    Defendants had knowledge that opioids have a high incidence of diversion. Still, Defendants recklessly and negligently filled suspicious orders of opioids, failed to report suspicious orders of opioids, and failed to halt or refuse to dispense suspicious orders of opioids.

224.    Defendants acted recklessly and negligently in failing to maintain effective controls against diversion. Defendants acted intentionally and unlawfully in over-distributing opioids with the knowledge that they were not used for any legitimate medical purpose. Defendants

acted with actual malice and/or a conscious disregard for the rights and safety of Plaintiff's community, as their actions had a substantial probability of creating substantial public harm.

225.     The effects of Defendants' conduct are not insubstantial or fleeting.  Indeed, Defendants' unlawful conduct has so severely impacted public health on every geographic and demographic level that the public nuisance perpetrated by Defendants' conduct is commonly referred to as a "crisis" or an "epidemic."  It has cost people their lives and livelihoods, and otherwise caused serious injuries, and a severe disruption of public peace, order, and safety.

226.     As a direct and proximate result of Defendants' wrongful conduct, the County expended public moneys to mitigate the damage caused by opioids in the community and repair the injuries described in this Complaint.

227.     Plaintiff has suffered unique damages as a result of the public nuisance created by Defendants due to Plaintiff's unique position as a county within the State of Oklahoma. This harm includes, but is not limited to:

    a.  increased healthcare costs;
    b.  increase population in the foster care system and corresponding need for foster parents and foster-care funding;
    c.  increased incidence of Neonatal Abstinence Syndrome ("NAS") and costs associated with resulting need for hospitalization and care of NAS affected infants;
    d.  increased expenditure on emergency healthcare and medical services;
    e.  lost value of productive and health community members and County employees;
    f.  increased need for rehabilitative services, public welfare and service agencies, and drug abuse education and treatment offered by the County;
    g.  increased availability of drugs for criminal use and resulting increase in criminal occurrences;
    h.  increased incidence of heroin addicts who progressed from opioids to the use of heroin
    i.  increased number of addicted community members and resulting strain on law enforcement due to responses to overdoses, responses to domestic dispute calls, and responses to criminal occurrences; and

    j.   general interference with the enjoyment of life in Plaintiff's community.

    k.   increased expenditure on law enforcement, prosecutors and prosecutions, courts and court personnel, public defender services, fees from regional corrections and correctional facilities, probation and parole;

    l.   increased expenditure on public utilities, nuisance abatement, property damage repair, and code enforcement.

228.    Plaintiff has also lost tax revenue and incurred both direct and indirect costs as a result of workplace accidents, absenteeism, and decreased productivity from prescription drug abuse caused in whole or in part by Defendants' actions.

229.    Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' fraudulent activity and fraudulent misrepresentations.  Plaintiff does not seek damages for physical injury, mental anguish, or emotional harm, or any physical damages to property caused by Defendants' actions.

230.    Plaintiff seeks all legal and equitable relief as allowed by law, other than such damages disavowed herein, including injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by Defendants, attorney's fees, and pre- and post- judgment interest.

## **PRAYER**

WHEREFORE, Plaintiff prays that the Court grant the following relief:

1.    Order a jury trial on all issues so triable to determine damages as a result of the Defendants' actions outlined in this Complaint;

2.    Enter Judgment in favor of Plaintiff;

3.    Enter a temporary restraining order which:

    a.   Prevents all Defendants from continuing to violate Oklahoma laws;

b.  Mandates that Defendants promptly notify the appropriate authorities of any and all suspicious orders for controlled substances as received from parties who are located in Craig County;

c.  Mandates Defendants submit their system for determining suspicious order to those Oklahoma authorities for prior approval, and to enjoin Defendants from distributing any opioids in Craig County for any illegitimate medical purpose;

d.  Mandates Defendants provide Plaintiff with the assistance necessary to address the addiction and the resulting destruction left by Defendants' actions to abate the damage they have caused and are continuing to cause; and

e.  Otherwise abates the public nuisance caused in whole or in part by Defendants' actions

4.  Enter a permanent restraining order which:

a.  Prevents Defendants from continuing to violate Oklahoma laws;

b.  Mandates that Defendants promptly notify the appropriate authorities of any and all suspicious orders for controlled substances as received from parties who are located in Craig County;

c.  Mandates Defendants submit their system for determining suspicious order to those Oklahoma authorities for prior approval, and to enjoin Defendants from distributing any controlled substance in Craig County for any illegitimate medical purpose;

d.  Mandates Defendants provide Plaintiff with the assistance necessary to address the addiction and the resulting destruction left by Defendants' actions to abate the damage they have caused and are continuing to cause; and

e.  Otherwise abates the public nuisance caused in whole or in part by Defendants

5.  Order equitable relief, including, but not limited to restitution and disgorgement;

6.  Award punitive damages for Defendants' willful, wanton, malicious, oppressive, and intentional actions as detailed herein;

7.  Award attorneys' fees and costs; and

8.     Award such other relief as this Court deems just and fair;

PLAINTIFF SEEKS A TRIAL BY JURY FOR ALL COUNTS SO TRIABLE.

Respectfully submitted,


s/  *Brad Barron*_____
Bradford D. Barron, OBA #17571
Zachary T. Barron, OBA #18919
The Barron Law Firm, PLLC
PO Box 369
Claremore, OK 74018
(918)341-8402 Phone
(918)515-4691 Fax
bbarron@barronlawfirmok.com
zbarron@barronlawfirmok.com

and

James D. Young (***Pro Hac Vice***)
Florida Bar No. 567507
jyoung@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
501 Riverside Ave., Ste 1200
Jacksonville, FL 32202
(904) 398-2722 Phone

*Attorneys for Plaintiff*